FILED

1
2   Ann Welhaf
    Plaintiff, *in propria persona*
    8935 Fort Hunt Road          2013 MAR 26  A 9:23
3   Alexandria, VA  22308
    Ph 571-338-8944              CLERK US DISTRICT COURT
4   ann.welhaf@cox.net          ALEXANDRIA, VIRGINIA

5            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA,
6                    ALEXANDRIA DIVISION

7   ANN WELHAF,                )   Case No.: 1:13CV388
                               )              AJT/TRJ
8            Plaintiff,        )   COMPLAINT
                               )
9                              )
    vs.                        )
10                             )
    FAIRFAX COUNTY SCHOOL      )
11  BOARD, CLIFF HARDISON,     )
    AARON HELMICK, BARBARA     )
12  MAHONEY, in their individual and
    official capacities,
13
14           Defendants
                        _____

15
16       The plaintiff in the above-captioned matter does hereby, for her complaint

17  against the above named defendants in their individual and official capacities,

18  allege as follows:

19                  **JURISDICTION AND VENUE**
20
21       1.  The jurisdiction of this Court is invoked pursuant to 28 USC §§

22  1331,1343, 2201, 2202, and 20 U.S.C. § 1681, on the grounds that this action

23  arises under the following provisions of law: (1) Title IX of the Act of Congress

24
    known as the "Education Amendment Act of 1972," 20 U.S.C. § 1681, *et seq.*
25
26

(Title IX); (2) the First and Fourteenth Amendments to the United States Constitution; and (3) 42 U.S.C. § 1983.

2.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because plaintiff's claims arise in this district.

**PARTIES**

3.  Plaintiff is an adult citizen of the United States who currently resides in Alexandria, Virginia.

4.  Defendant Fairfax County School Board (FCSB) is a political subdivision of the State of Virginia having its administrative office at 8115 Gatehouse Road, Suite 5400, Falls Church, VA 22042.

5.  The FCSB provides public education services throughout Fairfax County, Virginia, through the Fairfax County Public Schools (FCPS).  At all relevant times, FCSB, through the schools that it operates, was the employer of each of the other named defendants in this matter.

6.  Defendant Cliff Hardison (Hardison) is a citizen of the United States, resident of Virginia, and at all relevant times was the Principal of West Potomac High School (WPHS), operated by the FCSB.  Hardison is named in this suit in his official and individual capacity.

7.  Defendant Aaron Helmick (Helmick) is a citizen of the United States, a resident of Virginia, and at all relevant times was the Athletic Director at WPHS. Helmick is named in this suit in his official and individual capacity.

8.  Defendant Barbara Mahoney (Mahoney) is a citizen of the United States, a resident of Virginia, and at all relevant times was the Assistant Athletic Director at WPHS.  Mahoney is named in this suit in her official and individual capacity.

9.  Hereafter, any reference to the "WPHS Administration" shall be a reference to Hardison, Helmick, and Mahoney, collectively.

10.  At all relevant times, all of the above-named individual defendants had authority to and did act on behalf of the FCSB and FCPS.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**I.      General**

11.  Plaintiff re-alleges and incorporates by reference paragraphs 1- 10 above.

12.  Plaintiff is a mother of five minor children, all of whom attended FCPS during all times relevant to this matter.  Plaintiff is not employed by FCPS.

13.  Plaintiff's minor daughter, J.L., attended WPHS for her freshman year (2010-2011 academic year), her sophomore year (2011-2012 academic year), and is currently a student at WPHS for her junior year (2012-2013 academic year).  She was a member of the Varsity cheerleading team at WPHS for all three years.

14. Plaintiff's minor daughter, K.L., attended WPHS for the first semester of her freshman year (2012-2013 academic year). She was a member of the varsity cheerleading team at WPHS in fall 2012.

15. Plaintiff's minor son, R.L., is currently a senior at WPHS, and has been a student at WPHS since academic year 2009-2010.

II.   **Plaintiff's Complaints To WPHS Administration About Gender Discrimination And Other Problems In The WPHS Cheerleading Program**

16. Plaintiff re-alleges and incorporates by reference paragraphs 1 - 15 above.

17. For each of the 4 academic years of 2008-2009, 2009-2010, 2010-2011, 2011-2012, the WPHS cheerleading program was led by head varsity coach known as "coach CJ," who was also a chemistry teacher at WPHS. During each of those 4 years, the cheerleading program was comprised of approximately 30-40 female athletes per year.

18. At all relevant times, defendant Mahoney was a personal friend of coach CJ, and Mahoney was the FCPS official who conducted and completed coach CJ's annual performance appraisals with respect to her coaching duties.

19. During all 4 years of coach CJ's tenure, the WPHS cheerleading program was a competitive failure, placing last (except for one year, placing 7th

out of 8) in the Patriot District to which the school belongs and never advancing to regional level of competition.

20.  After lengthy personal observations and discussions with athletes and parents over a period of years, plaintiff formed the opinion that the WPHS cheerleading program was unsuccessful from a competitive standpoint based in large part upon the following systemic problems with the program:

(a) the WPHS administration treating the cheerleading program in a chauvinistic, antiquated, gender discriminatory manner, based upon a stereotype of what cheerleading was many years prior;

(b) the WPHS administration failing to provide the cheer athletes with necessary resources to succeed, including failing to provide specialized training in tumbling and stunting; and

(c) coach CJ's lack of leadership and her emotionally abusive conduct toward many of the cheer athletes which created a hostile environment, including but not limited to calling them demeaning names such as "sluts" and demeaning them in front of male students.

21.  Plaintiff believed that because of the concerns set forth in paragraph 20 (a)-(c) above, her daughters and other WPHS cheer athletes were being deprived of an important educational opportunity to learn and grow their skills in the sport of cheerleading, and that this deprivation caused these female athletes to be treated

differently than male athletes at the school in that the males were given better support and resources within their male sports of choice.

22. In her capacity as a concerned parent, and in good faith and in an effort to seek positive change in the failing cheerleading program, on *no less than* the 2 occasions listed below, plaintiff told one or more members of the WPHS Administration of her opinions as stated above in paragraphs 20 and 21, inclusive:

a. December 13, 2011, in a personal meeting between plaintiff and Helmick at WPHS. Another cheer parent, plaintiff's daughter J.L., and another unrelated cheer athlete were present at this meeting.

b. February 7, 2012, in a public meeting held by WPHS Administration wherein they invited parents of the athletes in the cheerleading program to come to the school and provide feedback about the program. Numerous parents (and some student athletes) were present at this meeting. Helmick conducted the meeting and two assistant principals from WPHS were present and took notes at the meeting.

23. On both occasions, plaintiff presented her opinions in a passionate but peaceful way that was appropriate as to time, manner, and place.

24. For purposes of clarity, the following are among the many specific matters and concerns that plaintiff verbally raised with the WPHS Administration on the two dates listed above in paragraph 22:

(a) that coach CJ regularly engaged in conduct that was emotionally abusive towards several of cheer athletes, including:

(i)  referring to certain of the cheer athletes as "sluts," looking "slutty," or as having "bad reputations" with boys at the school;

(ii)  prohibiting the cheer athletes from interacting with any males students while in a cheerleading uniform and/or demeaning them in front of males students if caught doing so; and,

(iii)  frequently and improperly accessing the private web pages of certain athletes on a variety of social networking sites (by using her access as a FCPS employee) for no legitimate educational purpose but rather to obtain photos or posts of the athletes and harass them with the items.

(b)  that Plaintiff believed the WPHS Administration did not respect cheerleading as the athletic sport that it has become today, that their attitudes about cheerleading were outdated, and that they lacked pride in or regard for the program;

(c)  that Plaintiff believed the WPHS Administration had failed to take the program seriously as a sport that could yield scholarship or other financial assistance at the collegiate level (and failed to encourage or facilitate the cheer athletes' access to those resources in the same manner that they did for other male athletes in male-dominated sports);

(d)  that Plaintiff believed the WPHS Administration had failed to allocate the necessary resources to the cheer program to enable it to succeed and failed to make it safe for the athletes, including failed to provide proper coaching expertise or stunting and tumbling training;

(e) that Plaintiff believed the WPHS Administration had failed to encourage or ensure that out-of-season conditioning was available to or encouraged for the cheer athletes in the same manner that they did for other male-dominated sports;

(f)  that Plaintiff believed the WPHS Administration had failed to take any steps to investigate the numerous parent complaints that had already been lodged and made known to them regarding the coach's improper conduct, the total lack of success of the program, and the many injuries sustained by the athletes under the coaching staff's supervision.

25.  On *no less than* the 2 specific dates listed in paragraph 22, plaintiff informed the WPHS Administration that she believed that their attitude about and indifference towards the cheerleading program as specifically described in paragraphs 20-24, inclusive, was tantamount to "gender discrimination."

III.  **Plaitiff's Written Documentation Of The Issues That She Had Raised Verbally With The WP Administration**

26.  Plaintiff re-alleges and incorporates by reference paragraphs 1 - 25 above.

27. In an effort to document some of her concerns as set forth above in paragraphs 20 through 25, inclusive, plaintiff drafted a 15-page report (*the Report*) and attached thereto several exhibits as examples of the issues discussed. *The Report* is attached hereto as <u>Exhibit A</u>.

28. On February 6, 2012, Plaintiff provided the WPHS Administration with an electronic PDF copy of *the Report* and all exhibits via email, and on February 7, 2012, Plaintiff provided the WPHS Administration with a hardcopy of the report and all exhibits at the public meeting that they held for the purpose of obtaining parent feedback.

29. The Report specifically detailed many of the same concerns that plaintiff had also raised verbally with the WPHS Administration as set forth above in paragraphs 20-25, inclusive, and included some additional concerns.

30. Plaintiff's Report included the following statement:

Coach CJ did absolutely nothing with the athletes and exerted no meaningful effort to prepare them or give them any chance of success at the District meet--which District meet was always the first time each season that the team had had ever performed before an audience, much less competed before the same. This is absolutely derelict of her responsibilities as a coach, educator, and purported mentor to these young athletes, and the school's prolonged tolerance thereof inexplicable. Undoubtedly, the school administration would not turn a blind-eye to a football program that was utterly unable to succeed, and a change in coaching staff and/or review of the training procedures would be a given. *To ignore the same situation in the cheer program sounds in gender discrimination and reflects a total lack of respect for cheerleading as a sport and these students as athletes.*

Exhibit A, p. 3 (emphasis added).

31. *The Report* also included specific examples of Mahoney participating with coach CJ in incidents wherein female cheer athletes were treated in a belittling and demeaning manner, including an incident wherein Mahoney and coach CJ together ordered a cheer athlete to hand-write a letter to explain "why she wanted to be a cheerleader."

32. Mahoney received a copy of *the Report* from Helmick and Hardison in February 2012, and Mahoney knew that plaintiff wrote *the Report* and knew that plaintiff had complained to Helmick and Hardison about all of the matters described above in all of the preceding paragraphs.

33. Sometime in February 2012, Helmick asked coach CJ why she thought there were parent complaints about her and the cheer program. According to Helmick, coach CJ "put her head down" and "resigned" her coaching position without responding to his inquiry. Coach CJ later resigned her teaching position and is no longer a FCPS employee.

## IV. Hardison Forwards *The Report* To His Supervisors

34. Plaintiff re-alleges and incorporates by reference paragraphs 1 - 33 above.

35. By email dated February 13, 2012, Hardison forwarded *the Report* at Exhibit A to his supervisor, Deborah Tyler (Tyler), Assistant Superintendent, by

email, but told her not to bother printing it because it would take "a ream + of paper." See Exhibit B.

36. In the February 13, 2012 email to Tyler, Hardison also informed her that Coach CJ had resigned, but reiterated to her that "as indicated to you in our discussion," he did not want that resignation made public because he did not want plaintiff (or another named parent who had lodged similar complaints) "to think they ran the coach off." *Id.*

37. Hardison also expressed to Tyler in the February 13, 2012 email his desire to ensure that plaintiff (and the other named parent) were *not* part of the new cheer coaching staff and were *not allowed* to be involved in the hiring of the new coach. *Id.*

38. Tyler (and her predecessor) responded to Hardison's February 13, 2012 email by reply email stating "Sounds good-agree with all your comments." *Id.*

## V.     Job Openings And The Retaliation

### A.     First Vacancy Announcement

39. Plaintiff re-alleges and incorporates by reference paragraphs 1 - 38 above.

40. In March 2012, WPHS published an announcement for the job opening of "head varsity coach" for the cheerleading program.

41. While the advertisement did not specifically state that WPHS was also seeking two assistant coaches for the cheerleading program, WPHS intended to use *and did use* the March 2012 announcement to also seek candidates for the 2 assistant coaching positions.

42. The job advertisement published by WPHS for the coaching position(s) did not contain any job selection criteria or otherwise indicate the requisite experience or credentials for any one of the 3 vacant coaching positions. The announcement did not contain a job description or state what were the job duties.

B.   **Plaintiff's Job Application, Her Knowledge of the Cheerleading Sport, And Her Professional Qualifications For Any One Of The Three Vacant Coaching Positions**

43. Plaintiff re-alleges and incorporates by reference paragraphs 1- 42 above.

44. For approximately 8 years, Plaintiff has studied, followed, and been actively involved in some capacity in the sport of performance cheerleading.

45. Plaintiff is knowledgeable about all aspects of the cheerleading sport as it exists today, including but not limited to the following:

(a) the evolution of cheerleading to the extremely athletic sport that it has become today;

(b) proper training techniques and skills progression to ensure safe athlete skill development; and

(c) safety rules and guidelines applicable to the conduct, teaching and oversight of the cheerleading sport in both the school/high school setting and the more rigorous "all-star" setting.

46.   Plaintiff currently is and at all relevant times was a coach-member of the National Federation of State High School Associations (NFHS), and a safety-certified cheerleading coach by the AACCA (American Association of Cheerleading Coaches and Administrators).

47.   For each of the past two academic years, plaintiff has served as coach to a performance cheerleading team of middle school students in Fairfax County, which team is known as the Panther Cheer Club (www.panthercheerclub.org).

48.   Plaintiff currently operates the Panther Cheer Club through the company that she owns, the Panther-Wildcat Spirit Club (PWSC, inc.), a Virginia corporation recognized by the Internal Revenue Service as a section 501(c)(3) not-for-profit organization.

49.   The Panther Cheer Club has successfully competed in local and national cheerleading competitions over the past two years and has gained local recognition for the same. See www.panthercheerclub.org.

50.   No athlete in the Panther Cheer Club has ever sustained any meaningful injury (beyond minor scrape or bruise) while under the supervision of plaintiff or her staff.

51. By way of professional background, Plaintiff has been a trial attorney employed by the same employer for approximately 23 years. Her experience includes:

(a) several years of serving as managing and supervisory counsel for a large government field litigation office, where she supervised numerous subordinates;

(b) teaching several college level courses at a variety of community and four-year colleges;

(c) speaking and teaching at a variety of meetings of local and national bar associations; and

(d) the receipt of numerous professional awards and accolades for outstanding leadership and work performance.

52. On March 14, 2012, plaintiff submitted to Helmick (the hiring official designated in the announcement) her resume, cover letter, and application for the coaching position(s), which materials detailed all of the credentials specified in paragraphs 43 through 51, inclusive.

53. In April 2012, Helmick and Mahoney convened a panel to interview the 5 applicants who applied for the coaching position(s). The panel was comprised of Helmick and Mahoney, who alone and in their sole discretion together with Hardison had the authority to make and did make the hiring decisions.

54. Mahoney and Helmick permitted a variety of other individuals comprised of parents, students, and other FCPS employees to sit on the interview panel to give input. However, the ultimate hiring decision rested with and was made by the WPHS Administration.

55. Plaintiff was objectively a qualified and competitive applicant for all 3 coaching positions available at WPHS. Her professional credentials (years/level of experience managing/supervising, education, professional accomplishments, demonstrated leadership, *etc.*) and coaching credentials were superior to those of the other candidates on many factors that are objectively relevant to leading any successful athletic or other program.

56. The input from the courtesy panelists regarding plaintiff's interview and qualifications was overwhelmingly positive. The following are quotes from the interview forms of several panelists regarding plaintiff's interview:

       (a) "In terms of vision, this candidate offered the most",

       (b) "Strongest interview skills so far . . . Very enthusiastic and has great ideas to improve the program",

       (c) Has some great ideas. Wants program restored",

       (d) "Well composed - well spoken. Can definitely handle other cheer parents",

       (e) "Clear organization and administrative leadership", and

       (f) "Passionate about cheer & school pride",

(g) "Restoration and excitement."

**C.    Helmick, Mahoney, Hardison Blackball Plaintiff From Consideration For Any One Of The 3 Vacant Positions And From Serving As A Volunteer**

57.   After the interviews, Helmick, Hardison, and Mahoney discussed the candidates and invited two candidates (other than plaintiff) to attend a second interview before Hardison.  They asked the remaining two candidates (other than plaintiff) to serve as assistant coaches in the cheerleading program.

58.   Hardison, Helmick, and Mahoney, collectively decided to reject plaintiff's candidacy for all 3 vacant coaching positions.  Plaintiff was the only applicant not given further consideration for any one of the 3 positions on the coaching staff.

59.   Helmick called plaintiff on April 18, 2012, to tell her that he, Hardison, and Mahoney, had decided that she was not the right "fit" and would not be offered a position on the coaching staff.

60.   During this phone call, plaintiff told Helmick that she believed that he, Hardison, and Mahoney, had failed to give her candidacy fair and objective consideration because of the complaints that she had made to them about all of the matters set forth in paragraphs 20-25, inclusive.  Plaintiff told Helmick that she believed the WPHS Administration had blackballed her and that such retaliation was unlawful and a violation of her rights.

61. During the call, plaintiff further told Helmick that her desire to fix the broken cheer program for her daughters and other students that she knew and cared about was so strong that she was willing to serve on the coaching staff on a volunteer unpaid basis in any capacity, and she offered to do so.

62. Alternatively, Plaintiff told Helmick that, if a salary was required, she was willing to donate the salary back to the cheerleading program to provide stunting and tumbling clinics for the cheer athletes.

63. Helmick outright rejected plaintiff's offer to serve as an unpaid volunteer coach and informed her that the WPHS Administration did not want her to be a part of the coaching staff in a paid or volunteer/unpaid capacity.

**D.   Plaintiff's Elevation Of The Retaliation To the Superintendent's Office**

64. Plaintiff re-alleges and incorporates by reference paragraphs 1 - 63 above.

65. On April 19, 2012, plaintiff sent an email to Hardison and Helmick and stated the following:

> The school's refusal to consider further my candidacy is retaliatory, improper, and not in the best interests of the kids you are charged with serving. I request that you reconsider your decision and consider my candidacy in an objective and proper manner. Our prior interactions about matters unrelated to my candidacy are wholly irrelevant to any set of objective criteria that should guide this process.

Exhibit C.

66. Plaintiff also restated her willingness to serve as an unpaid volunteer on the coaching staff, and reaffirmed that her motivation to serve was to "ensure that [the program] is put exactly where it needs to be--I have 2 daughters who will be in the program next year, and I will not tolerate one more unsuccessful season." *Id.*

67. Hardison responded to plaintiff via email on April 20, 2012 with the following two lines: "I am truly unsure how to respond to your email. All the candidates interviewed have qualities and expertise and much consideration has gone into the selection of a candidate that best aligns with our school. Sincerely, Cliff." *Id.*

68. On April 20, 2012, plaintiff contacted William Curran, Director of Athletics for FCPS, and Deborah Tyler, Assistant Superintendent for FCPS (Cluster 4), by phone and email and told them in detail about all matters discussed above in paragraphs 1-67, inclusive, and requested that they intervene to stop the retaliatory conduct by Hardison, Helmick and Mahoney, and ensure that her candidacy is given fair consideration by an unbiased group of decision makers.

69. At this time, plaintiff gave Tyler and Curran a copy and electronic PDF copy of *the Report* at Exhibit A and all exhibits. Plaintiff was unaware that Tyler and Curran had been in possession of the Report since February 2012, when Hardison had forwarded it to them via email. See Exhibit B.

70. On Friday May 4, 2012, Tyler contacted plaintiff by phone. Tyler told plaintiff the following, "I see no way to fix this situation other than to start completely over with a new interview process before a new panel."

71. Tyler told plaintiff that the outcome of the first interview panel would be wholly "discarded," that a new announcement would be issued, and that all candidates would have to reapply. Tyler assured plaintiff that a fair process would play out and that she would be given fair consideration this next time.

72. The phone call ended with Tyler telling plaintiff that "Hardison will have to accept the recommendation of the new panel."

**E.     The Second Vacancy Announcement And Sham Interview
        Of Plaintiff**

73. Plaintiff re-alleges and incorporates by reference paragraphs 1 - 72 above.

74. WPHS re-advertised the coaching positions in late June and July 2012. The job announcement read identically to the first job announcement in March 2012.

75. According the statements by the WPHS Administration, plaintiff was the *only* job applicant under the second vacancy announcement.

76. As part of her job application, plaintiff submitted her resume and a cover letter that detailed all of her credentials as outlined above in paragraphs 43 -

51, inclusive, as well as included four strong letters of support from parents of cheerleaders that plaintiff had coached.

77.  On July 25, 2012, plaintiff arrived at WPHS for the second job interview.  Helmick and Mahoney were the lead panelists, and approximately 3 other participants from the first panel were in attendance.

78.  Mahoney was visibly agitated and rolled her eyes at plaintiff when she entered the room and continued this throughout the entire interview.

79.  Helmick appeared similarly rushed and annoyed.

80.  Plaintiff was shocked and humiliated by having to appear before Helmick, Mahoney, and prior panelists, but maintained composure and endeavored to complete the interview.

81.  Despite the fact that plaintiff was the *only* job applicant, Helmick, Mahoney, and Hardison had no intention of fairly considering plaintiff for any one of the three coaching positions.

82.  At the time plaintiff appeared before Helmick and Mahoney for the second interview, they had already arranged for the two runner-up candidates from the first interview process to serve on the coaching staff, and the process of hiring these two individuals had begun with FCPS human resources department.

83.  The second interview of plaintiff conducted by Helmick and Mahoney was a sham and not a legitimate endeavor by them or anyone else within FCPS to

give plaintiff fair consideration for the coaching positions or to weigh her credentials for the position in an objective manner.

84.   Plaintiff contacted Tyler and Curran the day after the July 25, 2012 interview and asked them why they had permitted Helmick and Mahoney to conduct the interviews and had not followed through with their word that an entirely new hiring process would play out and that plaintiff would be given fair consideration before unbiased individuals.

85.   Curran ignored all contacts from plaintiff requesting an explanation.

86.   Tyler responded via email on July 27, 2012, and stated "Due to the prior circumstances, we tabled the outcome of the previous panel and extensively reviewed the processes and procedures . . . we are now ready to proceed." Tyler offered no other comments or explanation.

**F.    Helmick, Mahoney, And Hardison Blackball Plaintiff For A Second Time From Consideration For Any One Of The 3 Vacant Coaching Positions**

87.   Soon after the second interview, in August 2012, Helmick called plaintiff to inform her *for the second time* that she would not be offered a position on the WPHS coaching staff, and he declined her second offer to serve as an unpaid, volunteer assistant coach in the WPHS cheerleading program.

88.   After the second sham interview of plaintiff was conducted, in August 2012, the WPHS Administration attempted to hire an individual for the head coach

position who had not applied for the job under the procedures of the first or second vacancy announcement.

89.  In August 2012, Helmick, Mahoney, and Hardison referred this person to the human resources department of FCPS in an effort to hire her for the head cheerleading coach position, but she was unable to pass the human resource clearance process due to information in her background, and the WPHS Administration was precluded from hiring her.

90.  In August 2012, within one week of the start of cheerleading season, the WPHS Administration still had not hired a head cheerleading coach but refused to re-consider plaintiff to fill the position or serve as an unpaid volunteer.

91.  Within days of the start of the fall cheerleading season, the WPHS Administration asked two candidates from the first interview process (in March 2012) to serve as co-head coaches because, according to statements made by the WPHS Administration, neither of these individuals were qualified or "ready" yet to serve alone as "head coach."

92.  One of the co-coaches had recently graduated from WPHS (2008 or 2009) and had attended but not graduated from college.  Her credentials included that she had recently been a cheerleader and had served the prior year as a volunteer coach in her neighborhood recreation league's sideline cheerleading program, of which her father is the President.

93. The other co-coach was employed as a teacher's aide at another facility within FCPS. She had never coached cheerleading before serving as a co-head coach of the WPHS cheerleading program in fall 2012.

94. Neither of the co-coaches were safety certified by the AACCA.

95. During all years of the recent past, WPHS had 3 cheerleading coaches (head varsity, junior varsity, and freshman coaches) in the program.

96. WPHS had the funding and ability to hire 3 cheerleading coaches again for the fall 2012 season.

97. Helmick, Hardison, and Mahoney, elected to forego filling the third available and funded coaching position in fall 2012, instead of hiring plaintiff to serve as one of the three coaches, declining to permit her to serve in either a paid or unpaid capacity. Their decision left the three teams in the cheerleading program under the sole supervision of the two head co-coaches.

98. The two head co-coaches openly complained to plaintiff, plaintiff's daughters, other parents, the cheer athletes, and the WPHS Administration about being over-burdened.

99. Despite the WP Administration's knowledge that the cheer program lacked sufficient coaching resources in fall 2012, it refused to reconsider plaintiff for a position on the cheer coaching staff in either a paid or unpaid capacity.

100. Midway through the fall 2012 season, the WPHS Administration asked a teacher at the school to attend practices and assist the co-head coaches.

101. Several cheer athletes sustained meaningful injuries during the fall 2012 season while participating in the WPHS cheerleading program, including an athlete who dislocated her hip, and an athlete who broke her hand during a stunt.

102. Plaintiff's daughter, J.L., sustained a severe contusion to her shoulder when a flyer (who had not been properly trained or supervised to perform the level 3 skill at issue) landed directly on her collarbone. The injury rendered J.L. unable to participate in stunting with her level 5 all-star competition squad (a travel squad at a private gym) for approximately 2 weeks.

103. Plaintiff and her daughters became concerned that the latters' continued participation on the WPHS competition cheer squad exposed them to an unreasonable risk of injury given the lack of proper training and coaching expertise, and they decided to leave the competition squad before the district meet.

104. Their decision to do so caused them and plaintiff a great amount of emotional distress as they had spent years following and looking forward to being a part of their high school program.

105. The WPHS competition cheerleading team finished the 2012 fall season in last place (8th out of the 8) in the Patriot District and did not advance to the regional competition.

## VI.   The Second Retaliation/Mahoney Retaliates Against Plaintiff Because She Participated In the Lawful Complaint Process By Filing A Retaliation Complaint Within FCPS

106.  Plaintiff re-alleges and incorporates herein by this reference paragraphs 1 - 105, inclusive.

107.  In August 2012, Plaintiff sought redress for the conduct described herein that she considered to be unlawful retaliation in violation of Title IX and other laws, and she filed a grievance within the internal process of FCPS at the Office of Equity and Compliance (OEC).[1]

108.  Mahoney was angry that plaintiff had filed a grievance with OEC.

109.  In an effort to threaten and intimidate plaintiff, and in direct retaliation against plaintiff for filing the internal complaint with the OEC, Mahoney set off on a course to try and find derogatory information about plaintiff and her not-for-profit Virginia corporation, the PWSC, inc., that operated the Panther Cheer club.

110.  Mahoney abused her employment position of public trust as the assistant athletic director at WPHS on several occasions for the purpose of gaining

---

[1] One of the important aspects of Title IX and its implementing regulations is their requirement that recipients adopt and publish internal grievance procedures to promptly and equitably (in an unbiased manner) resolve complaints alleging discrimination on the basis of sex, including complaints such as the instant one regarding retaliation for raising Title IX issues. See 28 C.F.R. § 42.408(a); *Title IX Grievance Procedures: An Introductory Manual*, U.S. Department of Education, Office for Civil Rights (1987).

access to private financial or other information about plaintiff and her company,

which information Mahoney had no legitimate employment-related need to obtain.

111. For example, in September 2012, Mahoney used her position to improperly cause an investigation against plaintiff and her company regarding their use of FCPS facilities for a cheer camp that it had held 4 months prior at a local FCPS middle school facility.

112. The following are direct quotes from an email chain dated September 14, 2012, between Mahoney and Cathy Lichtenfels, the FCPS employee who coordinates use of FCPS facilities by non-profit entities:

> Mahoney: Cathy, Can you please tell me if the Panther cheer camp at Sandburg was ran through you all? Thank you.

> Lichtenfels: What dates has she requested at WPHS?

> Mahoney: *Sorry, Cathy, I must not have been clear.* I wanted to know if this group went through the community use process this past summer to run a camp. Maybe there are different rules for middle school?

> Lichtenfels: No different rules. I do not know of one at Sandburg, but have emailed Adrian to check.

> Mahoney: So, if they didn't run it by community use, who gave them permission and how did they get the space? Is this something your office looks into? *I won't blow smoke, Cathy. I'm interested in their finances and what set of rules they are following.*

Exhibit D (emphasis added)

113. Mahoney had absolutely no legitimate, employment-related need to obtain the information sought as set forth in paragraphs 111-112, and Mahoney sought the information solely in an effort to find derogatory information about plaintiff to threaten and intimidate plaintiff in retaliation for her having filed a complaint.

114. Within days of Mahoney's illegitimate inquires as set forth above in paragraphs 111 - 112, Ms. Lichtenfels contacted plaintiff, announced that she was from the FCPS office of community use and indicated that she was investigating plaintiff's June 2012 use of FCPS middle school property.

115. Lichtenfels began to ask plaintiff many specific questions about the financial details of the camp (fees/costs, whether employees were paid, whether plaintiff was paid, etc.).

116. Lichtenfel's inquiries were made solely at the behest of Mahoney and resulted solely due to Mahoney's request to Lichtenfel's office to investigate plaintiff's use of FCPS property in June 2012, which use had been fully and properly authorized.

117. On September 16, 2012, Mahoney contacted plaintiff's business partner and requested that she come to WPHS for a meeting with her under the pretext that she was trying to be helpful and facilitate the donation and transfer of some of WPHS's excess property (cheer mats). The WPHS administration had

promised to donate the mats for the use of the Panther Cheer Club athletes long before any of the matters discussed in this Complaint had occurred.

118.   When plaintiff's business partner arrived at WPHS on September 18, 2012, for the meeting, Mahoney directly threatened her and told her that, because plaintiff had caused her to be investigated, "she had better hope that she [plaintiff] is squeaky clean." Mahoney demanded answers to intrusive questions about plaintiff and the finances of plaintiff's company, PWSC, inc., including but not limited to intrusive questions about its tax status, employees, tax filings, plaintiff's compensation, *etc*.

119.   Mahoney threatened plaintiff's business partner that, "if she did not provide her with copies of the financial statements of [plaintiff's] company," she would get them through the Freedom of Information Act.

120.   Plaintiff's business partner contacted plaintiff after the meeting and stated that she felt personally threatened and afraid due to Mahoney's angry and vindictive demeanor.

121.   Immediately after the meeting between Mahoney and Plaintiff's business partner took place, on September 18, 2012, Mahoney wrote an email to Hardison to pre-emptively explain her version of what occurred at the meeting. The following is a quote from the email that Mahoney wrote to Hardison:

> Just so you know, I had a meeting with [Plaintiff's business partner] today . . .   We ended up talking about Panther Cheer club at

Sandburg. *I was upfront in saying my interest stemmed from her 'business partner', Ann Welhaf, raising concerns about our practices up here and I wanted to know how they ran things.* I asked questions about finances, judging, ethnic make-up-most of the stuff we've been asked by Mrs. Welhaf. . . I have no doubt [Plaintiff's business partner] is already talking to Ann Welhaf about my interest. I believe my questions were appropriate *but seriously doubt they will be perceived as such.*

Exhibit E (emphasis added).

122.   Upon learning of Mahoney's threats, plaintiff sent Mahoney an email dated September 18, 2012, and informed her that her inquiries were retaliatory and improper, that there was no legitimate purpose for the inquires, and that any questions she may have about plaintiff or her company's finances should be directed to her.  Plaintiff copied Hardison and Helmick on this email.

123.   Mahoney responded to plaintiff and lied and stated that the she was merely "trying to verify best practices with a feeder program," and professed that she "didn't even know" that plaintiff had a company.

124.   Mahoney copied Hardison and Helmick on the email, who did not intervene or try to stop Mahoney's lies to plaintiff or her improper retaliatory conduct.

125.   Plaintiff responded and reminded Mahoney that plaintiff's company and her status as the president and treasurer had been openly disclosed on the resume that plaintiff had submitted twice before for the 3 coaching positions.

126.  All of the aforementioned matters caused Plaintiff to feel threatened by Mahoney's vindictive conduct and afraid of what steps she may be capable of taking in retaliation, particularly given that plaintiff had 3 children who were students at WPHS, two of whom were very involved in athletics at the school.

127.  Accordingly, plaintiff forwarded her email exchange with Mahoney to the OEC, explained in detail all the matters set forth above in paragraphs 106 - 126, and told the OEC that she felt threatened by Mahoney's conduct.  Plaintiff asked the OEC to intervene and stop Mahoney from continuing this retaliatory, improper conduct.

128.  On September 19, 2012, Dennis Erdman, an investigator from the OEC, called Mahoney and told her that she had "screwed the pooch by not knowing [plaintiff's] company was Panther Cheer and asking questions about their finances," and told Mahoney that she had "no standing as a qualified interview panelist" given that she did not even know basic matters contained on plaintiff's resume.  See Exhibit F.

129.  Mahoney then immediately on September 19, 2012, wrote an email to Hardison and informed him of the OEC's admonishment of her and told Hardison, "Again, my abject apologies for providing ammunition and causing further problems." Id.

130.  Within days of Mahoney's conduct as described herein in paragraphs 106-129, on September 24, 2012, Helmick sent plaintiff an email and stated that the his office had previously "misspoke" when it had agreed to donate the excess cheer mats to the Panther Cheer Club, and he informed her that WPHS would no longer be donating the mats, rationalizing that the donation had not been properly approved under FCPS regulations.

131.  Plaintiff immediately researched the regulations and provided all paperwork necessary to have the mat donation to her non-profit corporation properly approved.  The paperwork and request were in compliance with applicable regulations regarding FCPS donations of unused property to non-profit entities.

132.  Nonetheless, due to Mahoney and Helmick's interference, FCPS has since that time steadfastly refused to donate the mats for use by the Panther Cheer Club as previously promised.

133.  The mats continue to be stored by FCPS and are not used by any school or division within FCPS or any other county residents who may find a good use for them.

134.  Within days of Erdman telling Mahoney behind-the-scenes that (1) she had "screwed the pooch", and (2) that she had no standing to sit on the interview panel given she did not even know what was contained on plaintiff's resume, OEC

investigator Nurit Anderson (Anderson) contacted plaintiff and told her that she believed that Mahoney had done *absolutely nothing wrong* by making the inquiries into plaintiff's finances or engaging in any of the conduct set forth herein.

135.   On October 19, 2012, Anderson issued a report on behalf of the OEC wherein she concluded that Helmick, Mahoney, and Hardison, did not engage in any improper retaliation towards plaintiff.

136.   Anderson rationalized that, because the none of the defendants had read *the Report* at <u>Exhibit A</u>, they didn't know that Plaintiff had alleged that the coach had ever used the term "slut." So, according to Anderson, they could not possibly have retaliated against plaintiff.

137.   Alternatively, Anderson concluded that, even if they had read the report, all other candidates had "superior credentials" to plaintiff.

## COUNT 1

**AGAINST DEFENDANT FCSB FOR UNLAWFUL RETALIATION IN VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681, *et. seq.***

**I.     The Law Generally**

138.   Plaintiff adopts and re-alleges each and every allegation of paragraphs 1- 137 heretofore contained in this Complaint as is specifically recited herein.

139.   Title IX of the Educational Amendments of 1972 provides:

No person in the U.S. shall, on the basis of sex be excluded from participation in, or denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal aid.

140.   The WPHS cheerleading program is a covered "educational program or activity" under Title IX.

141.   FCSB is a "recipient" of funds under Title IX.

142.   At all times relevant, Hardison, Helmick, and Mahoney stood in the shoes of, and were acting with the authority of and as representatives of, defendant FCSB, the fund "recipient" for purposes of Title IX of the Education Amendments of 1972.  Their actions were at all times in furtherance of the custom of the FCSB, or were approved, acquiesced in and ratified by the Board.

143.   Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action.  Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

144.   The Supreme Court recently stated:

Retaliation is discrimination "on the basis of sex" because it is an intentional response to the nature of the complaint: an allegation of sex discrimination.  We conclude that when a funding recipient retaliates against a person because he complains of sex discrimination,

this constitutes intentional "discrimination" "on the basis of sex," in violation of Title IX.

*Jackson*, 544 U.S. at 174.

145.  The merits of any underlying complaint of sex discrimination are irrelevant in assessing a retaliation complaint.  The prohibited conduct is the act of retaliation itself.  *See, e.g., Benson v. Little Rock Hilton Inn*, 742 F.2d 414, 416-17 (8th Cir. 1984) (discussing remedial purpose of retaliation complaints and irrelevance of merits of underlying discrimination claim).

146.  Where retaliation occurs because a complainant speaks out about sex discrimination, Title IX's "on the basis of sex" requirement is satisfied; the complainant is herself a victim of discriminatory retaliation, regardless of whether she was the subject of the original complaint.  *Jackson*, 544 U.S. 167, 183.

## II.   Elements of Cause Of Action

### A.   *Prima Facie* Case

147.  To establish a *prima facie* case of retaliation under Title IX, plaintiff must show that (1) she engaged in statutorily protected expression; (2) defendant took an adverse action against plaintiff; and (3) a causal link existed between the two events.  *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, (2006); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

## B.    Plaintiff Engaged In Protected Acts

148.  When Plaintiff complained to the WPHS Administration about Coach CJ's conduct as described in paragraphs 20-25, inclusive (*i.e.*, frequently referring to certain of the cheer athletes as "sluts" or "slutty" or as having "bad reputations with boys"), and in *the Report* at Exhibit A, her complaints constituted complaints about sexual harassment, a form of gender discrimination proscribed by Title IX.[2]

149.  Plaintiff's complaints to the WPHS Administration as set forth above in paragraphs 20 - 25, inclusive, and Exhibit A, including her complaints about its outdated attitudes towards the cheerleading program and its failure to provide the program the necessary resources to succeed, constituted complaints about gender discrimination that is proscribed by Title IX.[3]

150.  When plaintiff engaged in all of the acts described herein and made the specific complaints to the WPHS Administration about all of the matters set

---

[2] Hostile put-downs of women and use of derogatory names or words towards them is sexual harassment. *See, e.g., Passananti v. Cook County*, 689 F.3d 655 (7th Cir. 2012) (use of derogatory words towards women (*i.e.*, bitch, slut) and demeaning comments are gender-specific and constitute sexual harassment); *see also Canutillo Independent School Dist. v. Leija*, 101 F.3d 393 (5th Cir. 1996) (Title IX prohibits sexual harassment of students by school employees); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) (recognizing that sexual harassment can occur even where the harasser and victim are of the same sex).

[3] Where a school, based upon archaic, stereotypical, or chauvinistic assumptions of females does not accommodate effectively the interests of female students, that institution intended to treat women differently because of their sex in violation of title IX. *See Pederson v. Louisiana State University*, 213 F.3d 858 (5th Cir. 2000).

forth in paragraphs 20-25, and *the Report* at <u>Exhibit A</u>, inclusive, Plaintiff engaged in "protected acts" within the meaning of Title IX of the Education Amendments of 1972.

151.  Helmick, Mahoney, and Hardison, and the FCSB (through its employees), were well-aware that Plaintiff engaged in these protected acts prior to taking the adverse action set forth below.

## C.   Adverse Action

152.  Helmick, Hardison, and Mahoney took the following adverse actions against plaintiff in April 2012 and July/August 2012:

(a) unfairly blackballed plaintiff from any fair opportunity to compete for one of the 3 open coaching positions;

(b) unfairly and unreasonably refused to hire her for any one of the three vacant coaching positions, despite her having been objectively and overwhelmingly qualified to serve in any one of the three vacant positions; and,

(c) unfairly and unreasonably refused to permit her to serve as a volunteer assistant in the cheer program out of spite.

## D.   Causal Connection Between Protected Acts And Adverse Action

153.  The foregoing adverse actions taken by Helmick, Mahoney, and Hardison were causally linked to plaintiff's having engaged in the protected acts

and were in direct retaliation by them against plaintiff for so engaging in those protected acts.

154. The causal link is demonstrated by direct and circumstantial evidence which will be overwhelmingly proven at trial,[4] including *but not limited to*:

(a) all of the evidence, facts and circumstances specifically outlined in this complaint;

(b) the temporal proximity (almost immediate) of the protected acts to the adverse actions;

(c) direct statements and admissions made by Helmick, Mahoney, and Hardison at or about the time of the adverse acts regarding their dislike for plaintiff and their desire to shut out and blackball plaintiff from any participation in the hiring of the cheer coaching staff or from serving on the coaching staff; and,

(d) their unreasonable refusal to permit plaintiff to serve as an unpaid volunteer, and their preference instead to permit the program to proceed woefully and dangerously under supervised in order to keep plaintiff away to spite her.

---

[4] A retaliation claim can be established either through direct evidence of retaliation or circumstantial evidence that would support an inference of retaliation. *See, e.g., Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010).

155.  In engaging in the retaliatory conduct, Helmick, Mahoney, and

Hardison acted in reckless disregard for the best interests of the students that they

are charged with serving, and acted recklessly, knowingly, and with malice and

spite towards plaintiff.

156.  As a direct and proximate result of their unlawful retaliation, plaintiff

has sustained damages in amounts to be proven at trial, including but not limited to

the damages attributable to the specific items described in the damages section set

forth below in paragraphs 181(a) - (e), inclusive, which paragraphs are

incorporated herein by this reference.

## COUNT 2

**AGAINST DEFENDANT FCSB FOR UNLAWFUL RETALIATION FOR A
SECOND TIME IN RETALIATION FOR PLAINTIFF'S PARTICIPATION
IN THE LAWFUL COMPLAINT PROCESS, CONSTITUTING A SECOND
VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF
1972, 20 U.S.C. § 1681, *et. seq.***

157.  Plaintiff adopts and re-alleges each and every allegation of paragraphs

1- 156 heretofore contained in this Complaint as is specifically recited herein.

158.  The Title IX regulations incorporate the requirement in the Title VI

regulations, which provides that:

> (e) **Intimidatory or retaliatory acts prohibited.**  No recipient or
> other person shall intimidate, threaten, coerce, or discriminate against
> any individual for the purpose of interfering with any right or
> privilege secured by section 601 of the Act or this subpart, or because
> he has made a complaint, testified, assisted, or participated in any
> manner in an investigation, proceeding, or hearing under this subpart.

COMPLAINT - 38

28 C.F.R. §42.107(e) (Department of Justice Title VI Regulation).

159.  After Helmick, Mahoney, and Hardison engaged in the first retaliatory acts as outlined above in paragraphs 1 - 105, inclusive, plaintiff exercised her right to file a complaint with the OEC for the unlawful retaliation.

160.  Mahoney did thereafter, as outlined above in paragraphs 106 - 132, intimidate, threaten, coerce, and discriminate/retaliate against plaintiff for the purpose of interfering with plaintiff's exercise of her right to file a complaint, and Mahoney did so to punish, threaten and intimidate plaintiff for the filing of the complaint.

161.  In engaging in the retaliatory acts a second time as set forth in paragraphs 105 - 133, inclusive, Mahoney did again for a second retaliate against plaintiff in violation of Title IX.

162.  As a direct and proximate result of Mahoney's second act of unlawful retaliation, plaintiff has sustained damages in amounts to be proven at trial, including but not limited to the damages attributable to the specific items described in the damages section set forth below in paragraphs 181(a) - (e), inclusive, which paragraphs are incorporated herein by this reference.

## COUNT 3

**AGAINST INDIVIDUAL DEFENDANTS HARDISON, HELMICK, AND MAHONEY FOR VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS WHILE THEY WERE ACTING UNDER COLOR OF VIRGINIA LAW IN VIOLATION OF 42 § U.S.C 1983.**

**I.     The Law Generally**

163.  Plaintiff adopts and re-alleges each and every allegation of each paragraphs 1- 162 heretofore contained in this Complaint as is specifically recited herein.

164.  The First Amendment to the United States Constitution guarantees every citizen the right to freedom of Speech.  The Fourteenth Amendment to the United States Constitution prohibits state and local governments from depriving persons of life, liberty, or property without certain steps being taken to ensure fairness, and it expressly makes the Bill of Rights, including the right to freedom of speech, applicable to the states, and requires that the States recognize the substantive and procedural rights guaranteed to its citizens.

165.  Speech is generally protected by the First Amendment, with restrictions on only limited types of speech, such as obscenity, defamation, and fighting words, *R.A.V. v. St. Paul*, 505 U.S. 377, 382-83 (1992), none of which is applicable here.

166. A private citizen's right to criticize public officials, including local school officials, is clearly protected by the First Amendment. *See Jenkins v. Rock Hill*, 513 F.3d at 580; *Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) ("The right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is the central meaning of the First Amendment.").

167. Pursuant to 42 U.S.C. § 1983:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress . . .

168. A private citizen may bring a cause of action against one or more local government employees acting under color of State law, such as Helmick, Hardison, and Mahoney, under 42 U.S.C. 1983, if those employees retaliate against her for her having exercised her First Amendment rights of free speech.

169. Unlike typical First Amendment claims, retaliation claims do not involve the direct prohibition of speech, but rather are constitutional violations which "may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972).

170. At all relevant times, Helmick, Mahoney, and Hardison were officials and employees of FCPS, the public school system created by and operated pursuant to Virginia state law.

171. At all relevant times and in carrying out their job duties and in engaging in all acts described herein, Helmick, Mahoney, and Hardison, were acting under color of Virginia State law within the meaning of 42 U.S.C. § 1983.

## II. Elements of Cause of Action

172. The following are the three elements to such cause of action:

(a) the plaintiff was engaged in constitutionally protected activity/speech;[5]

(b) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and

(c) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Jenkins*, 513 F.3d at 585-86.

173. When plaintiff engaged in all the acts outlined above in paragraphs 20 - 25, inclusive, including telling the WP Administration about all of her concerns

---

[5] Unlike her Title IX claims, the protected speech for First Amendment purposes need not be about conduct proscribed by Title IX.

and issues with the cheerleading program and submitting her concerns to them in writing (Exhibit A), plaintiff was engaging in protected activities and protected speech and was exercising her right to freedom of speech under the First Amendment to the United States Constitution.[6]

174. The adverse actions that Helmick, Mahoney, and Hardison, took against plaintiff as outlined in this Complaint, including but not limited to their blackballing plaintiff from any fair opportunity to be considered for a position on the coaching staff and depriving her of any fair opportunity to serve as a paid or unpaid volunteer on the coaching staff, would chill an ordinary person/parent from speaking out to school officials or continuing to speak out about the matters that plaintiff spoke (issues of concern at her children's school) .

175. The WPHS Administration, and specifically Helmick, Mahoney, and Hardison, acting under color of Virginia law, subjected plaintiff to deprivations of her right of free speech under the First and Fourteenth Amendments to the U.S.

---

[6] Plaintiff maintains that the "public concern" test first articulated in *Pickering v. Board of Education*, 391 U.S. 563 (1968) is inapplicable to a retaliation claim by a non-employee private citizen. *See Jenkins v. Rockhill*, 513 F.3d at 580 (for a discussion of circuit law on this issue). Alternatively, were the test applicable, the matters about which plaintiff spoke (*i.e.*, systemic issues with the program, mistreatment of several students, an unsafe program with several students injured, a chauvinistic attitude towards the program as a whole and a failure to give the program resources and training comparable to male sports, *etc.*) satisfied the test, as such grievances were not merely personal and were of concern to the community.

Constitution by basing their actions towards her to an impermissible extent on her exercise of those rights.

176.  After engaging in the first retaliatory acts of violating plaintiff's constitutional rights outlined above in paragraphs through 1-105, inclusive, Mahoney did then unlawfully threaten, harass, intimidate, and retaliate against plaintiff for a second time for plaintiff's engaging in yet another protected act of free speed (*i.e.*, filing a complaint with the OEC), as set forth in paragraphs 106-137.

177.  In engaging in the retaliatory acts a second time as outlined in paragraphs 106 - 137, Mahoney did again for a second time violate plaintiff's constitutional rights guaranteed under the First and Fourteenth Amendments to the United States Constitution in the same manner and to the same extent as alleged in paragraphs 163 - 175, inclusive.

178.  In violating plaintiff's rights in the manner set forth above in all paragraphs of this Count 3, Helmick, Mahoney, and Hardison violated a clearly established constitutional right (*i.e.*, First Amendment right to free speech) of which a reasonable person would have known, and acted knowingly, with malice and spite towards plaintiff, and in reckless and callous indifference to plaintiff's constitutionally protected rights.

179.  As a direct and proximate result of defendants' violation of plaintiff's First Amendment right to free speech, plaintiff has sustained damages in amounts to be proven at trial, including but not limited to the damages attributable to the specific items described in the damages section set forth below in paragraphs 181(a) - (e), inclusive, which paragraphs are incorporated herein by this reference.

## DAMAGES

180.  Plaintiff adopts and re-alleges each and every allegation of each paragraphs 1- 179 heretofore contained in this Complaint as is specifically recited herein.

181.  As a direct and proximate result of all of the foregoing conduct and violations of plaintiff's rights as specifically alleged in all paragraphs to this Complaint, plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial, including but not limited to the damages attributable to the following:

(a) loss of opportunity to earn the coaching wages attributable to any one of the 3 vacant coaching positions from which plaintiff was blackballed;

(b) personal humiliation and damage to plaintiff's self-esteem and personal and business reputation;

(c) loss of benefit and value of the excess cheer mats that WPHS had agreed to donate before defendants' intentional interference and acts to sabotage the donation;

(d) out-of-pocket expenses in bringing this action, including all costs and fees incurred and yet to be incurred that are associated with bringing and prosecuting this action;

(e) extreme mental and emotional anguish and distress, which anguish and distress suffered was particularly heightened as to this particular plaintiff given a variety of factors uniquely present in this non-typical hiring situation, which factors will be shown at trial and include (but are not limited to):

(i) that plaintiff had a long-time, personal, legitimate, and pure-of-heart desire to see the program turn around and become a success for her children and her community;

(ii) other matters about the nature and circumstances of her having sought the position which will be demonstrated at trial, which exacerbated the damages suffered.

## PUNITIVE DAMAGES

182.  Further, because Helmick, Hardison, and Mahoney violated plaintiff's rights in the manner set forth above with malice and spite towards plaintiff, and in reckless and callous indifference to plaintiff's well-established constitutional rights, plaintiff is entitled to an award of punitive damages for their conduct.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief:

1. Regarding Counts 1 and 2, plaintiff prays that the Court:

(a) find that defendant FCSB violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et. seq.*, when it did, through its named employees, unlawfully retaliate against plaintiff, and

(b) order FCSB to compensate and make whole plaintiff by awarding her monetary damages for harm suffered and proven at trial, including but not limited to damages attributable to all harm specifically set forth in paragraph 181(a) - (e), inclusive, and for such other monetary relief as may be deemed appropriate in amounts to be determined at trial to be fair and just.

2. Regarding Count 3, plaintiff prays that the Court:

(a) finds that defendants Helmick, Hardison, and Mahoney, did each individually and acting under color of law, violate plaintiff's constitutional right to freedom of speech guaranteed under the First and Fourteenth Amendments to the

United States Constitution, and find that they are liable to plaintiff for doing so pursuant to 42 U.S.C. § 1983;

(b) finds that the right violated, plaintiff's right to freedom of speech, was a well-established right under the First and Fourteenth Amendments to the United States Constitution and that a reasonable employee would have known of those rights;

(c) finds that Helmick, Mahoney, and Hardison, did so violate plaintiff's constitutional rights with reckless and callous indifference to her rights; and,

(d) orders Helmick, Mahoney, and Hardison, jointly and severally liable to compensate plaintiff for all damages suffered and proven at trial, including but not limited to damages specifically set forth in paragraph 181(a) - (e), inclusive, and for punitive damages.

4. With respect to all Counts, that the Court:

(a) orders that plaintiff recover from all defendants, jointly and severally, her costs in bringing this action, including filing fees, fees to serve process, copying fees, attorney fees, and any other out of pocket fees that may be incurred in prosecuting this action;

(b) orders and awards any such other and further relief as it deems just and proper under the circumstances.

1  United States Constitution, and find that they are liable to plaintiff for doing so

2  pursuant to 42 U.S.C. § 1983;

3
4         (b) finds that the right violated, plaintiff's right to freedom of speech,

5  was a well-established right under the First and Fourteenth Amendments to the

6  United States Constitution and that a reasonable employee would have known of

7  those rights;

8
9         (c) finds that Helmick, Mahoney, and Hardison, did so violate

10  plaintiff's constitutional rights with reckless and callous indifference to her rights;

11  and,

12
13         (d) orders Helmick, Mahoney, and Hardison, jointly and severally

14  liable to compensate plaintiff for all damages suffered and proven at trial,

15  including but not limited to damages specifically set forth in paragraph 181(a) -

16  (e), inclusive, and for punitive damages.

17
18      4. With respect to all Counts, that the Court:

19         (a) orders that plaintiff recover from all defendants, jointly and

20  severally, her costs in bringing this action, including filing fees, fees to serve

21  process, copying fees, attorney fees, and any other out of pocket fees that may be

22
23  incurred in prosecuting this action;

24         (b) orders and awards any such other and further relief as it deems just

25  and proper under the circumstances.

26

1    Plaintiff waives trial by jury and entrusts to the Court the decision with

2  respect to all issues in this case.

3

4

5

6   _____

7   Ann Welhaf

8   Plaintiff, *in propria persona*
    8935 Fort Hunt Road
9   Alexandria, VA  22308
    Ph 571-338-8944
10

11

12

13              Dated        3/26/13

14                        _____

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT - 49